S10A1158. HOLLAND v. HOLLAND.

(700 SE2d 573)

NAHMIAS, Justice.

We granted John Holland's application for discretionary appeal to review the trial court's post-divorce order setting forth how the profits from the sale of the parties' lake house should be calculated and distributed. We now affirm in part and reverse in part.

The parties were married in 2003, and the lake house was purchased in July 2004 for $350,000. The lake house was titled solely in Mary Holland's name, and there was no outstanding loan against the house at the time of purchase. Mary took out a revolving line of credit for $150,000 in August 2004, with a maturity date of July 2007, using the lake house as collateral. Mary withdrew the entire $150,000 and used it as a down payment on the parties' former marital residence. In August 2005, under the same loan and account numbers, Mary extended the line of credit to $250,000, again using the lake house as security. She withdrew the additional $100,000 at that time and deposited it into an account for the parties' jointly owned business. The line of credit now had a maturity date of July 15, 2008.

In January 2006, the parties' entered into a post-nuptial agreement, and in May 2008, the parties were divorced, with the final decree incorporating the post-nuptial agreement. On July 21, 2008, Mary renewed the $250,000 line of credit with the same bank, under the same account and loan numbers. At that time, the account balance was $220,564. Mary made no further withdrawals on her line of credit after the $100,000 withdrawal in August 2005.

The post-nuptial agreement awarded the lake house to Mary as her separate property, but Paragraph 7 (b) also provided for its later sale and the distribution of the proceeds. On June 9, 2009, the trial court ordered the parties to consummate the sale of the lake house, and it was sold to a third party for approximately $320,000. A dispute arose regarding the distribution of the proceeds. John sought a declaratory judgment on the proper interpretation of Paragraph 7 (b), which provides in relevant part as follows:

> If the Lake House is sold to a third party, the parties shall then divide any net profit (net of debt on the Lake House, if any, commission, costs of sale, and taxes) equally (50/50), and then from his 50% share of the net profits, [JOHN] shall reimburse MARY immediately at the closing of the sale for Ninety-Eight Thousand Dollars ($98,000.00), and less any improvements . . . made by MARY into the Lake House from her Separate Property . . . , which represents MARY'S total separate investment in the Lake House.

The parties agreed that certain sums should be deducted from the purchase price before distribution to them, but they disagreed about the pre-distribution deduction of other items, including the line of credit. The trial court ruled that the $220,564 balance of the line of credit should be deducted pre-distribution because the property was used as collateral for the loan. There was then a net profit of $67,911.10 left for distribution — $33,955.55 for each spouse under the formula set forth in the post-nuptial agreement. The trial court also ruled that Paragraph 7 (b) required John to reimburse Mary at the closing for her separate $98,000 investment in the property. The court ordered him to pay his half of the net profit ($33,955.55) to Mary immediately and an additional $64,044.45 by February 28, 2010.

1. John contends that the trial court erred in ordering that the sale proceeds from the lake house be used to pay off the $220,564 line of credit. He argues that the phrase "net profit" in Paragraph 7 (b) should be construed to mean the gross sales price of the house less the debt and expenditures specifically incurred only for the house. Under this interpretation, because Mary's line of credit was not used to improve the lake house, it had nothing to do with the profit realized from the parties' investment in the house.

However, Paragraph 7 (b) defines "net profit," in relevant part, as "net of debt on the Lake House," with no language limiting the term "debt" to money borrowed to improve the house itself. Mary conveyed title to the house to the bank to secure the line of credit. Under these circumstances, it is clear that the line of credit consti-

tuted a "debt on the Lake House" within the plain language of the post-nuptial agreement. See *Grain Dealers Mut. Ins. Co. v. Pat's Rentals*, 269 Ga. 691, 693 (505 SE2d 729) (1998) (holding that the unambiguous terms of a contract "require no construction, and the plain meaning of such terms must be given full effect").

John also argues that it would violate Paragraph 16 (a) (4) of the post-nuptial agreement to deduct the final line of credit from the lake house proceeds. That paragraph provides generally that debt incurred solely by one party after the marriage will be that party's separate debt unless it was incurred with the express permission of the other party. Pretermitting whether John waived his right to raise this point on appeal by failing to mention Paragraph 16 (a) (4) in the trial court, we conclude that John cannot prevail under this paragraph. In construing contracts, a specific provision will prevail over a general one. *Tacon v. Equity One*, 280 Ga. App. 183, 189 (633 SE2d 599) (2006); *Woody's Steaks v. Pastoria*, 261 Ga. App. 815, 818 (584 SE2d 41) (2003). Here, Paragraph 7 (b) provides that the parties' "debt on the lake house," which clearly included the lines of credit secured by the house, must be paid off when the house is sold. That specific provision prevails over the more general debt provision of Paragraph 16 (a) (4). Moreover, the record supports the trial court's explicit finding that John was aware of the first two lines of credit, which were used to purchase the parties' marital residence and to fund the parties' joint business, and further shows that John benefitted from those lines of credit without objecting to them. The record also clearly shows that the third line of credit was simply a continuation of that same debt.

For these reasons, the trial court did not err in ruling that Mary's line of credit constituted a "debt on the Lake House" and in ordering that the proceeds from the sale of the house be used to pay off the line of credit.

2. John next contends that, if this Court affirms the trial court's decision to pay off the line of credit with the lake house proceeds, the court erred by interpreting Paragraph 7 (b) to require him to pay Mary an out-of-pocket sum of $64,044.45, in addition to the $33,955.55 sum from his share of the net profits, in order for Mary to be reimbursed $98,000. We agree. The plain language of Paragraph 7 (b) requires John to reimburse Mary solely "from his 50% share of the net profits," not from any separate assets that he may have. See *Grain Dealers*, 269 Ga. at 693. Here, John's "50% share of the net profits" was $33,955.55. While the parties may have hoped or expected when they entered their post-nuptial agreement that the sale of the lake house would net a profit of at least $196,000, allowing John to pay Mary the full $98,000 from those profits, that did not occur, and the language of their agreement clearly limits John's

reimbursement to his 50% share of the net profits. We therefore reverse this part of the trial court's order.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

## DECIDED OCTOBER 4, 2010.

*McGee & Oxford, Donald L. Cook*, for appellant.
*Boyd, Collar, Nolen & Tuggle, John L. Collar, Jr., Amy K. Sullivan*, for appellee.